**EXHIBIT 6**

 **Ganfer**
**Shore**
**Leeds &**
**Zauderer** LLP

360 Lexington Avenue
New York, New York  10017

Tel: 212.922.9250, Ext. 266
Fax: 212.922.9335
mberman@ganfershore.com

October 1, 2021

**BY FEDERAL EXPRESS**

Ms. Heidi Dillard
Phlow Corporation
1001 Haxall Point #1B
Richmond, VA 23219

Dear Ms. Dillard:

This firm represents James Andrew Stiles. Pursuant to section 2.2.1 of the executed Phlow Amended and Restated Executive Employment Agreement ("the Agreement"), dated November 20, 2020, Mr. Stiles is providing twenty (20) days written notice of his intention to exercise his right to terminate the Agreement for *Good Reason* and is providing the required reasonable description of the actions constituting *Good Reason*. I am attaching the Agreement as **Attachment I** to this letter.

> **I.    Reasonable Description of the Significant Reduction of Executive's Responsibilities and Authority ("Good Reason for Termination")**

Mr. Stiles was a member of Phlow's Executive Committee when the Agreement was executed in November 2020. Responsibilities associated with being a member of the Phlow Executive Committee included access to company information and participation in company decision making at the highest level. This is where decisions are made regarding operations, hiring, organizational planning, strategic initiatives, etc. for the entire company. Executive Committee members prepare and participate in weekly Executive Committee meetings, monthly Board of Directors Update meetings, quarterly Board of Directors Meetings, and quarterly Off-Site Executive retreats.

In April 2021, Mr. Stiles was removed from the Phlow Executive Committee. As a result, he no longer had access to all of this company information and was denied and is no longer able to participate in this high-level company decision making. Mr. Stiles was no longer included in weekly Executive Committee meetings, monthly Board of Directors Update meetings, quarterly Board of Directors Meetings, and quarterly Off-Site Executive retreats.

Additionally in April 2021, Mr. Stiles' authority within the company was significantly changed due to the organizational realignment which moved the Government Initiatives Group to report to Chief Business Officer Dan Hackman. Prior to this restructuring, Mr. Stiles reported directly to the Chief Executive Officer Eric Edwards and had full control and authority over the operations of the Government Initiatives Group. Following this organizational

 **Ganfer Shore Leeds & Zauderer LLP**

realignment, Mr. Stiles no longer has, and subsequently Chief Business Officer Dan Hackman has final authority over decisions within the Government Initiatives Group.

Further, in July 2021, Phlow issued Purchase Order Approval authorities under which Mr. Stiles' purchase order authority was limited to expenses less than $250,000 associated with the Government Initiatives Cost Center. Government Initiatives purchase orders greater than $250,000 require approval by Chief Business Officer Dan Hackman. This represents a change to Mr. Stiles' authority within the company. Prior to July 2021, Mr. Stiles had authority to approve procurements up to $1,000,000 and had executed multiple agreements on behalf of the company exceeding $250,000.

The above constitutes a significant reduction of Mr. Stiles' responsibilities and authority in the Company under any objective or subjective standard.

## II.    Proposed Resolution

Pursuant to Section 2.2.1 of the Agreement, Mr. Stiles is entitled to the following:

*Full salary and benefits described in Section 1.3 above for a period of twelve (12) months in addition to a pro-rated portion of any applicable incentive compensation earned by the Executive prior to termination ("Severance Payment"). In addition, any unvested stock options granted to Executive shall be fully and automatically vested and Executive shall have 120 days to exercise and acquire vested options.*

Accordingly, the Severance Payment should include:

- $250,000 salary paid over 12 months
- Full medical benefits for 12 months
- 401k plan match for 12 months
- Pro-rated portion of Mr. Stiles 2021 performance bonus
- Payment for accumulated and unused vacation
- Immediate vesting of 100,000 stock options

Mr. Stiles would like to work with Phlow leadership to establish an agreeable separation period and date which will allow adequate time to fully transition any work and to train and support an appropriate replacement. During this notice period, he is committed to carrying out his current job duties and responsibilities.

Nothing contained in or omitted from this letter is or may be deemed a limitation, restriction, or waiver of any of my rights or remedies, all of which are expressly reserved.

Sincerely,

Mark A. Berman

cc: Mr. J. Andrew Stiles (by email)

## AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

This AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "*Agreement*") is entered into as of the date of the last signature affixed hereto (the "*Effective Date*"), by and between Phlow Corp., a Delaware benefit corporation (the "*Company*") and Andrew Stiles (the "*Executive*"). Company and Executive are collectively referred to hereinafter as the "*Parties*".

WHEREAS, Executive entered into an Executive Employment Agreement with the Company, dated November 12, 2020 (the "*Original Agreement*");

WHEREAS, by virtue of Executive's continued employment with the Company, Executive will have access to and be given Confidential Information and Trade Secrets regarding the Company;

WHEREAS, the Company has determined that it is necessary to amend the Original Agreement in order to protect the Company's legitimate business interests, its Goodwill, and to secure additional capital;

WHEREAS, in contemplation of a continued employment relationship, the Parties have agreed to enter into this Agreement to replace the Original Agreement;

WHEREAS, this Agreement will become effective immediately upon execution by the Parties;

WHEREAS, the Company desires to continue to employ the Executive on the terms and conditions set forth herein; and,

WHEREAS, the Executive desires to continue to be employed by the Company on such terms and conditions.

NOW THEREFORE, in consideration of Executive's employment with Company, and the representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

1.    POSITION; DUTIES; SALARY.

1.1    Position; Title.    Company will employ Executive in the position of EVP of Government Initiatives, and in that position, Executive will report to the Chief Executive Officer. Company retains the right to change Executive's title, reporting relationships, and duties (as described in Section 1.2 below) as may be determined to be in the best interests of Company; provided, however, that any such change in Executive's duties shall be consistent with Executive's training, experience, and qualifications. Executive shall perform such services and shall do such traveling, as may be reasonably required of Executive in the performance of Executive's duties.

1.2    General Duties. Executive acknowledges and agrees that Executive is being employed by Company with the understanding that Executive possesses a unique set of skills, abilities, and experiences that will benefit Company. Executive is an integral part of the Company's overall leadership team, as well as a key role model of its Vision, Mission, Culture,

1

and Shared Values as established by the Company from time to time. Executive shall render to the best of Executive's ability, on behalf of Company, services to and on behalf of Company, and shall undertake diligently all duties assigned to him by Company. Executive shall devote full time, energy, and skill to the performance of the services in which Company is engaged, at such time and place as Company may direct. Executive shall not undertake, either as a shareholder, employee, or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Company. Executive shall faithfully and industriously assume and perform with skill, care, diligence, and attention all responsibilities and duties connected with Executive's employment on behalf of Company. Notwithstanding the foregoing, the Executive will be permitted, with the prior written consent of the Chief Executive Officer ("*CEO*") (which consent will not be unreasonably withheld or delayed), act or serve as a director, trustee, or committee member of any type of business, civic or charitable organization, as long as such activities are disclosed in writing to the CEO, provided that the activities do not interfere with the performance of the Executive's duties and responsibilities to the Company as provided hereunder.

     1.3    Salary; Benefits; Bonus. Executive will be paid in equal semi-monthly installments of $10,417 which is equivalent to $250,000 on an annual basis, and subject to deductions for taxes and other withholdings as required by law or the policies of Company. Executive will be paid in the same manner and on the same payroll schedule in which all Company employees receive payment. Any increases in Executive's base salary shall be in the sole discretion of Company and determined annually, taking into account, among other factors, Company and individual performance, but nothing herein shall be deemed to require any such increase. Additionally, the Executive's base salary may be reduced in proportion to other Executives due to business conditions as determined by the Company's Board of Directors ("*Board*").

     1.3.1    Executive shall be eligible to participate in all incentive compensation plans, employee benefit plans, group benefit plans (including medical, dental, vision insurance and other health and welfare plans), policies, programs, or perquisites in which other Company employees participate, so long as such incentive plans, benefit plans, policies, programs, or perquisites are available. The terms and conditions of Executive's participation in Company's employee benefit plans, policies, programs, or perquisites shall be governed by the terms of each such plan, policy, or program.

     1.3.2    Executive shall be entitled to thirty (30) days of paid time off (PTO) per calendar year. During the first year, PTO days will be prorated based on Executive's date of hire and will accrue on a monthly basis and in accordance with Phlow policy. The intention is for PTO to be used for vacation, illness, personal time off and any other time off away from work. Unused PTO days will not carry over from calendar year to calendar year; but upon termination of Executive's employment, Executive will be entitled to payment for any accumulated and unused vacation for that year.

     1.3.3    The Compensation Committee, with the Board's concurrence, will define specific company and personal performance thresholds such that, if achieved, the Executive may earn additional incentive ("bonus") compensation up to 30% of base salary at or around the end of the calendar year and other periods as approved by the Board. Any such bonus plan shall require, as a condition to receiving a full bonus payout, that Executive be employed by the Company on the last day of the calendar year to which it applies, but shall otherwise provide for a pro-rated bonus for the Executive based on days worked in the relevant year.

2

1.4    Stock Options. Upon the Effective Date of Employment, and on each anniversary of the Effective Date, the Employee may receive options in the Company in amounts recommended by the Compensation Committee and approved by the Board pursuant to the terms and conditions of Phlow's stock option program entered into between the Executive and the Company. Solely in the event that the Company or substantially all of its assets are acquired, or a Change in Control of the Company occurs, all granted stock options would become exercisable just prior the closing of such transaction.

1.5    Business Expenses. Normal and reasonable business expenses will be reimbursed on a monthly basis per Company policy and upon completion of the appropriate expense request form.

2.    TERM AND TERMINATION

2.1    Term. The initial term of this Agreement is from the Effective Date through the first (1st) anniversary of the Effective Date (the "*Initial Term*") unless earlier terminated by either Party as provided below. Upon expiration of the Initial Term, this Agreement will automatically renew on a year-to-year basis (such renewal terms following the Initial Term referred to herein as the "*Renewal Term*", and together with the Initial Term, the "*Term*") unless terminated pursuant to the provisions of this Agreement. The Parties agree that during the Term, Executive's continued employment shall be subject to the terms and conditions of this Agreement unless otherwise agreed in writing by the Parties.

2.2    Termination.

2.2.1    Termination by Executive with Good Reason. Executive shall have the right to terminate this Agreement with Good Reason. "*Good Reason*" shall mean: (i) a material breach by the Company of this Agreement, (ii) a significant reduction by the Board of Executive's compensation, responsibilities, change in title or authority under this Agreement. Good Reason shall not be deemed to exist until Company has been provided at least twenty (20) days' written notice of such matter (including a reasonable description of the alleged action or failure) constituting Good Reason and Company has failed to cure such matter during such time. In the event Executive resigns for Good Reason during the Term, subject to Executive's execution of a release of claims in a form acceptable to the Company (the "*Release*") within sixty (60) days of Executive's date of termination of employment with the Company (the "*Employment Cessation Date*") and further subject to Executive's compliance with Phlow's Employee Confidentiality Agreement and the terms of this Agreement, Company shall be obligated to pay, subject to applicable withholdings, Executive or Executive's estate, as applicable, the salary and benefits described in Section 1.3 above for a period of twelve (12) months in addition to a pro-rated portion of any applicable incentive compensation earned by the Executive prior to termination ("*Severance Payment*"). In addition, any unvested stock options granted to Executive shall be fully and automatically vested and Executive shall have 120 days to exercise and acquire vested options.

2.2.2    Termination by Executive Without Good Reason. During the Term, Executive shall have the right to terminate this Agreement for any reason by providing at least sixty (60) days' notice to Company of such termination. During the notice period, Executive must use Executive's best efforts to continue to perform the duties and responsibilities set forth herein

3

and use Executive's best efforts to train and support Executive's replacement, if any. Any unvested stock options granted to Executive shall be cancelled and Executive shall have sixty (60) days to exercise and acquire vested options.

2.2.3   Termination by Company for Cause.   Company shall have the right to terminate this Agreement for Cause. "*Cause*" shall mean: (i) Executive's use or abuse of alcohol that materially adversely affects the Company's business or reputation or Executive's performance of his or her job duties; (ii) Executive's use of illegal drugs, illegal use of any controlled substance, or abuse of any controlled substance that adversely affects the Company's business or reputation or Executive's performance of his or her job duties; (iii) Executive's material failure to comply with any material terms and provisions of the Company's policies, rules, or regulations applicable to other employees of a similar level within the organization or material breach of this Agreement or any other agreement with the Company; (iv) Executive's material insubordination or refusal to comply with reasonable directions or instructions regarding the performance of his job duties and obligations; (v) Executive's gross negligence or misconduct that materially and adversely affects the business or reputation of the Company; (vi) Executive's act of material dishonesty, theft, or embezzlement from or fraud upon Company; or, (vii) Executive's indictment for, conviction of or entry of a nolo contendere plea to any felony or any misdemeanor involving a crime of moral turpitude. Upon Termination for Cause, Executive's compensation shall immediately end, and all stock options will be cancelled, whether vested or not.

Notwithstanding the foregoing, prior to terminating Executive for Cause under Section 2.2.3(iii), (iv), or (v), Company shall provide notice to Executive regarding the conduct which violates Section 2.2.3(iii), (iv), or (v) and provide Executive ten (10) business days to cure unless such conduct, by its nature, cannot reasonably be expected to be cured. However, the Company shall not be obligated to give Executive written notice and an opportunity to cure as a condition precedent to the Company having the right to terminate Executive's employment for which the Company has previously given to Executive written notice and an opportunity to cure pursuant to this Section at any time during the immediately preceding twelve (12) month period. In such event, the Company may terminate the employment of Executive for Cause without any further advance or written notice. The Company may place the Executive on paid leave for up to sixty (60) days while it is determining whether there is a basis to terminate the Executive's employment for Cause and such paid leave will not constitute Good Reason.

2.2.4   Termination by Company Without Cause.   During the Term, by providing at least sixty (60) days' notice to Executive, Company shall have the right to terminate this Agreement without Cause. In the event that Company terminates Executive without Cause during the Term and subject to Executive executing the Release, and further subject to Executive's compliance with Phlow's Employee Confidentiality Agreement and the terms of this Agreement, Company shall pay Executive, or Executive's estate, the Severance Payment. In addition, any unvested stock options granted to Executive shall be fully and automatically vested and Executive shall have 120 days to exercise and acquire vested options.

2.2.5   Termination by Death or Disability.   Executive's employment and rights to compensation under this Agreement shall terminate if Executive is unable to perform Executive's duties, with or without reasonable accommodation, due to (i) Disability, or (ii) death. In the event of a termination due to Executive's death or Disability, Executive or Executive's estate shall be entitled to all of Executive's earned compensation and benefits through the Employment Cessation

4

Date as well as the prorated portion of incentive compensation earned based on goals reached by the Executive. Any unvested stock options granted to Executive shall be cancelled, and Executive or Executive's estate shall have 120 days to exercise and acquire vested options. In addition, in the event Executive is terminated due to Disability, subject to Executive's execution of the Release, and further subject to Executive's compliance with Phlow's Employee Confidentiality Agreement and the terms of this Agreement, Company shall pay Executive the Severance Payment.

For purposes of this Agreement, "*Disability*" shall mean the Executive is entitled to receive long-term disability benefits under the Company's long-term disability plan, or if there is no such plan, the Executive's inability, due to physical or mental incapacity, to substantially perform his essential duties and responsibilities under this Agreement, with or without reasonable accommodation, for one hundred twenty (120) consecutive days or one hundred eighty (180) days out of any three hundred sixty-five (365) day period. Any question as to the existence of the Executive's Disability as to which the Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Executive and the Company. If the Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and the Executive shall be final and conclusive for all purposes of this Agreement.

3.    MODIFICATION.  If a court finds that any provision of this Agreement exceeds the time, geographic or scope limitations permitted by applicable law, the restrictions shall be reformed to the maximum time, geographic or scope limitations permissible. If a court refuses to enforce any term of these provisions, then the unenforceable terms shall be eliminated or otherwise modified by the court to the extent necessary to permit the remaining terms to be enforced.

4.    INDEPENDENT ENFORCEMENT.  Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements, except for the Employee Confidentiality Agreement, or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Executive against Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Executive or Company may have against the other, shall not constitute a defense to the enforcement by Company of any of the covenants set forth in Sections 3 and 4 of this Agreement by reason of any breach of (i) any other part of this Agreement, or (ii) any other agreement with Executive.

5.    EXECUTIVE'S REPRESENTATIONS AND WARRANTIES.  Executive represents and warrants to Company that: (a) to the best of Executive's knowledge and belief, that Executive's execution of this Agreement, and the performance of Executive's duties for Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Executive is bound; and (b) Executive has not and shall not solicit employees of any former employer with whom Executive has a non-solicitation agreement concerning their prospective employment relationship with Company during the term of Executive's non-solicitation agreement with Executive's former employer.

6.    ENTIRE AGREEMENT: NO AMENDMENT: GOVERNING LAW.  This Agreement represents the entire Agreement between the Parties concerning the specific subject matters hereof and supersedes any prior agreement between the Parties concerning the specific subject matter

5

hereof, including the Original Agreement. No amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought. This Agreement shall be construed by and governed in accordance with the laws of the Commonwealth of Virginia without regard to principles of conflicts of law. Notwithstanding the foregoing, the Parties acknowledge that the Phlow Employee Confidentiality Agreement, executed by the Parties, remains in full force and effect and such obligations run concurrently with the obligations contained in this Agreement.

7.    ASSIGNMENT. Executive may not assign any rights under this Agreement without the prior written consent of Company. Executive's obligations under this Agreement inure to Company, its successors and assigns. Company may, at any time and without Executive's further approval or consent, assign, or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer, or other assignee or successor with which Executive may become employed. Any such successor or assign is expressly authorized to enforce, and shall be bound by, the terms of this Agreement.

8.    SECTION 409A COMPLIANCE. The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*"), and the regulations and guidance promulgated thereunder (collectively, "*Code Section 409A*") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and Company of the applicable provision without violating the provisions of Code Section 409A. In no event whatsoever shall Company be liable for any additional tax, interest or penalty that may be imposed on Executive by Code Section 409A or damages for failing to comply with Code Section 409A.

9.    DEFINITIONS.

"*Business*" means the advanced (including automated technology) manufacturing within the United States of active pharmaceutical ingredients ("*API's*") and using those APIs to create, market, and sell generic medications throughout the United States.

"*Change in Control*" means that over 50% of Company's overall fully-diluted equity is acquired by one or more parties

"*Confidential Information*" means at any date, any information defined as Trade Secrets, and any information of Company that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through the fault or wrongful act of Executive or Executive's representative), from which Company derives value by virtue of its not being known to others, and with respect to which Company takes reasonable steps to maintain as confidential.

"*Goodwill*" means the expectation of continued patronage from client accounts and new patronage from prospective clients based on Company's investment in repeated contacts, business transactions, and other efforts to develop lasting customer relationships.

6

"*Person*" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, limited liability partnership, or a governmental entity.

"*Trade Secrets*" means at any date, any information of Company, that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), and which is valuable to Company and/or provides Company with a competitive advantage, including but not limited to the following: i) the identity of Company's customers and clients and any analyses and compilations thereof; ii) the identity, authority and responsibilities of key contacts and decision-makers employed by Company's customers and Active Prospective Clients; iii) information furnished to Company in confidence by its customers and Active Prospective Clients; iv) Company's and its corporate affiliates' business plans, marketing strategies, and pricing structure, and unpublished financial data and statements; and v) any and all other information that constitutes a trade secret under the governing trade secrets laws.

10.    NON-SOLICITATION. Executive acknowledges that during the course of his employment with the Company, he will obtain Confidential Information and Trade Secrets of the Company, the Business, and the Company's projects, customers, and employees and may develop Goodwill and relationships with these individuals and entities on behalf of the Company. Executive further understands that using this Confidential Information or Trade Secrets, or Company's Goodwill, to compete with the Company and/or interfere with its employment and business relationships could cause substantial harm to the Company. Accordingly, Executive agrees as follows:

(a)    Non-Interference. During the Term and for a period of twelve (12) months following the termination of Executive's employment with the Company for any reason (the "*Restricted Period*"), Executive shall not, except for the benefit of the Company, directly or indirectly, on behalf of Executive or any Person: (i) sell, market, or attempt to sell or market to any Restricted Client or Active Prospective Client any service or product competitive with the Business or otherwise competitive with any services or products sold, marketed, or actively under development by the Company within the last twelve (12) months of Executive's employment with the Company (the "*Competitive Products or Services*"); or (ii) provide or attempt to provide any Competitive Products or Services on any Restricted Project. Executive understands and acknowledges that Executive is prohibited from assisting any other Person to engage in the conduct prohibited by this Section 10(a).

For the purposes of this Agreement:

"*Restricted Client*" means any client or customer of the Company with whom Executive had contact, or about whom Executive learned Confidential Information, in the course of Executive's employment with the Company, provided that Company provided services or products to such client within the last twelve (12) of Executive's employment with the Company.

"*Active Prospective Client*" means any Person that is not a Restricted Client but with whom Executive had material discussions on behalf of the Company regarding the provision of the Company's products or services within the last twelve (12) months of Executive's employment with the Company.

7

"*Restricted Project*" means any project for which the Company is actively performing services, and for which Executive performed duties in the course of Executive's employment with the Company or about which Executive learned Confidential Information in the course of Executive's employment with the Company.

(b)     Non-solicitation of Employees and Contractors. During the Restricted Period, Executive shall not, except when loyally exercising Executive's duties for the benefit of the Company, directly or indirectly, on behalf of Executive or any Person, solicit or induce, or attempt to solicit or induce, any Restricted Individual to terminate his or her relationship with the Company, or hire or engage as an independent contractor any Restricted Individual.

"*Restricted Individual*" means any individual who at the time of any conduct by Executive prohibited by this Section 10(b) is, or within the six (6) months preceding such conduct was, an employee or independent contractor of the Company and with whom Executive had contact or whose identity Executive learned in the course of Executive's employment with the Company. Executive understands and acknowledges that Executive is prohibited from assisting any other Person to engage in the conduct prohibited by this Section 10(b).

11.     NON-COMPETITION. During the Restricted Period, Executive will not, directly or indirectly, on behalf of Executive or any other Person, whether as an employee, contractor, owner, or in any other capacity: (a) own, operate or manage a Competing Business; or (b) work in a Competing Position for a Competing Business. "*Competing Position*" means a position within the United States involving duties which are the same as or substantially similar to those duties Executive performed for the Company during the last twelve (12) months of Executive's employment with the Company. "*Competing Business*" means any Person engaged in the Business, or otherwise providing Competitive Products or Services, within the United States. Executive acknowledges that the Company's business is in the national interest of the United States and the Company's products and services are national in scope.

12.     REASONABLENESS, REMEDIES, SEVERABILITY, REFORMATION AND TOLLING.

(a)     The Parties acknowledge and agree that the restrictions contained in Sections 10 and 11 of this Agreement (the "*Restrictive Covenants*"), in light of the nature of Executive's employment by the Company and the competitive nature of the Business, are reasonable and necessary for, without limitation, the protection of the Company's Confidential Information, customer Goodwill, Trade Secrets, customer lists and the significant investment of the Company in developing, maintaining and expanding its business and Goodwill.

(b)     The Parties acknowledge and agree that the Company will suffer irreparable harm in the event of a breach by Executive of any of the Restrictive Covenants. Accordingly, the Parties agree that in the event of any such breach or attempted or threatened breach by Executive, the Company shall be entitled to institute and prosecute proceedings at law or in equity with respect to such breach. The Parties further recognize that because a remedy at law for any breach or attempted or threatened breach by Executive shall be inadequate, that in addition to the foregoing, the Company shall be entitled to temporarily and/or permanently enjoin Executive, without the

8

requirement of a bond, from engaging in any conduct in violation of the Restrictive Covenants and seek any other equitable relief as may be appropriate.

(c)    In any action or actions to enforce the provisions of this Agreement, including the Restrictive Covenants, in addition to damages awarded by a court of competent jurisdiction, the prevailing party shall be entitled to its costs, expenses, and reasonable attorneys' fees incurred in such an action. Additionally, no claim or cause of action that Executive may have or assert against the Company, whether predicated on this Agreement or otherwise, shall serve as or constitute a defense to the enforcement of any provision of the Agreement, including the Restrictive Covenants.

(d)    It is the intention of the parties that this Agreement shall be enforceable to the fullest extent permitted by law, and that if any restriction set forth in the Restrictive Covenants is deemed broader than necessary to protect the Company's legitimate interests, or is deemed unenforceable for any reason, that such determination shall not be deemed to affect the enforceability of any other provisions of the Restrictive Covenants. It is expressly intended by the Parties that the obligations and restrictions imposed by each section and subsection of this Agreement, including the Restrictive Covenants, shall be severable and separately enforceable. The Parties further agree that, in the event that a court of competent jurisdiction determines that any provision of the Agreement, including the Restrictive Covenants. is invalid or unenforceable under applicable law by reason of its scope or duration, then the scope of such provision or the extent of restriction imposed upon Executive's activities thereby may be modified by the adjudicating body making such determination, if permitted by law, by such amount as is minimally necessary to render such provision, as so amended, valid and enforceable under applicable law. The Parties agree to be bound by the adjudicating body's modification except that the Parties may appeal the ruling on any issue to the appropriate appellate court or courts, if applicable. Notwithstanding the foregoing, the parties acknowledge and agree that should a court of competent jurisdiction determine that the provisions of this Section 12(c) are impermissible under applicable law such provisions shall have no force and effect and the determination shall not affect the validity of the remainder of the Agreement, including any other provision, section, or subsection.

(e)    Should the Executive violate any of the terms of the Restrictive Covenants articulated herein, the Restricted Period will run from the first date on which the Executive ceases to be in violation of such obligation.

13.    GENERAL PROVISIONS.

(a)    Waiver of Breach. No waiver by either party of any condition or of the breach by the other of any term or covenant contained in this Agreement shall be effective unless in writing and signed by the aggrieved party. A waiver by a party in any one or more instances shall not be deemed or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term or covenant set forth in this Agreement. Moreover, the failure of either party to exercise any right hereunder shall not bar the later exercise thereof.

(b)    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute a single agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

(c)     Opportunity for Review. Executive understands the nature of the burdens imposed by the Restrictive Covenants contained in this Agreement. Executive acknowledges that Executive is entering into this Agreement on Executive's own volition, and that Executive has been given the opportunity to have this Agreement reviewed by persons of Executive's choosing. The Company and Executive have examined the Restrictive Covenants set forth herein and agree that the restraints imposed on Executive are reasonable in light of the legitimate interests of the Company, and they are not unduly harsh on Executive ability to earn a livelihood. Executive represents that on careful review, Executive knows of no reason why any Restrictive Covenant contained in this Agreement is not reasonable and enforceable.

**IN WITNESS WHEREOF**, Company and Executive have executed and delivered this Agreement as of the date written below.

**PHLOW CORP.**                                          **EXECUTIVE:**

Name: ROBERT MONNEY              Name: Andrew Stiles
Date: 11/16/20                             Date: 11/16/20

43754464_1

10