**EXHIBIT 10**

| | |
|---|---|
| **From:** | Nathan Richards |
| **To:** | Heidi Dillard; Andrew Stiles |
| **Cc:** | Mark A. Berman; Kim Daniel |
| **Subject:** | Re: A. Stiles - Stock Option Grant Documents |
| **Date:** | Tuesday, December 14, 2021 5:25:31 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |
| | image009.png |
| | image010.png |
| | image011.png |
| | image012.png |
| | Nov 2020 - Amended and Restated - Stock Option-Stiles.DOCX |

Hi Andrew,

Attached is the paperwork that details out the original vesting date for execution.  By my records, there are 31,250 shares that are vested and available for exercise under this agreement at $5.41 per share, for a total of $169,062.50.  Payment can be made by wire using the instructions below.

Bank Name:      JPMorgan Chase
Account Name: Phlow Corp
Routing No:      021000021
Account No:      716161218

Best,
Nathan


**Nathan Richards**
Director of Accounting
O   804 207 4593
M  804 683 3087



201 Havali Point #1B
Richmond, VA 23219
phlow-usa.com



We're Great Places to Work Certified!

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Monday, December 13, 2021 at 9:19 AM
**To:** Andrew Stiles <jandrew.stiles@gmail.com>
**Cc:** Nathan Richards <nrichards@phlow-usa.com>, "Mark A. Berman"
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

Andrew,

Thank you so much for your note.  We apologize for the slightly delayed response; we were dealing with other important matters and our board meeting last week.

First and foremost, we do not dispute your time at Phlow nor your stock option grant.  Our stance is that we never received your signed paperwork – did you send it?  I also do not believe Nathan "forgot" to send you documents.  As you know from your work with him during the past 19 months, he is incredibly contentious.  I'll circle up with Nathan to discuss updated documents and revert in a timely manner (as you know, we utilize outside counsel for these tasks).  We'll also provide any necessary payment (probably by wire) instructions, if necessary.

As you know, given our limited staff resources, we need to prioritize our work accordingly.  Since, as you mention, you are still a Phlow employee, we didn't deem your email correspondence as URGENT and CRITICAL to warrant an IMMEDIATE response.  Given your experience and government contracting expertise, I know you understand that we needed to deal with other critical vendor and board materials.  Unlike when we prioritized getting your daughter enrolled in healthcare after you missed the enrollment deadline (we dropped everything else to make sure we could get her coverage).

Have a great day!

Best,

Heidi

**From:** Andrew Stiles <jandrew.stiles@gmail.com>
**Date:** Monday, December 13, 2021 at 7:57 AM
**To:** Heidi Dillard <hdillard@phlow-usa.com>
**Cc:** Nathan Richards <nrichards@phlow-usa.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

**CAUTION:** This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you know the content is safe.

Heidi/Nathan,

If yall sent any needed documents on Friday, I did not receive them. Please advise. As of today, December 13, 2021, I am still a Phlow employee. Nathan has worked with all other employees to handle any needed administrative paperwork for the stock option plans. I am sure it is not your intent to show me disparate treatment.

Thanks,
Andrew

On Thu, Dec 9, 2021 at 2:32 PM Andrew Stiles <jandrew.stiles@gmail.com> wrote:

Heidi,

I do not understand how or why this has become problematic. I did not agree to the "alternate" vesting schedule...so the original vesting schedule should be in place. The original stock option plan had 25% vesting on 9/1/20 and then 6.25% every quarter thereafter. If Nathan should have sent me a new set of documents then I guess he forgot. That is ok, just send them over now and I will sign. Or is it Phlow's position that I have no vested stock options despite 19+ months of service time?

Thanks,
Andrew

On Thu, Dec 9, 2021 at 12:56 PM Heidi Dillard <hdillard@phlow-usa.com> wrote:

Andrew,

Thank you for your note.  While it is accurate you called Nathan the next week after his August 13 email to you, it was not clear to him that you wanted the "alternate" vesting nor does he recall telling you to not sign the Amended and Restated version.  If those things occurred, Nathan would have delivered a new set of documents to you to execute (which is how he was handling the process).  In addition, there is no record of you following up for additional documents.  However, if you will please provide any documents or correspondence where you followed up with Nathan on this matter, I will be glad to review the same.  We also certainly can search through your email correspondence as well.

Best,

Heidi

**From:** Andrew Stiles <jandrew.stiles@gmail.com>

**Date:** Wednesday, December 8, 2021 at 4:00 PM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Heidi Dillard <hdillard@phlow-usa.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

**CAUTION:** This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you know the content is safe.

Hi Nathan & Heidi,

Nathan sent the attached email on August 13, 2021 which included the *Amended and Restated Notice of Stock Option Grant* and highlighted the "alternate" vesting schedule which pushed the first vesting tranche back to January 1, 2022 from the original planned date of September 1, 2021. Per Nathan's request in the email, I called him the following week to discuss the "alternate" vesting schedule. On that call, I made it clear I did not want the "alternate" vesting schedule , and instead, wanted to keep the planned vesting schedule from the original agreement with the first 25% tranche vesting September 1, 2021. As such, Nathan told me not to sign the *Amended and Restated* version sent August 13 which is why I did not return it with signature.

Please advise.

Thanks,
Andrew

On Wed, Dec 8, 2021 at 1:06 PM Nathan Richards <nrichards@phlow-usa.com> wrote:

All,

Attached is copy of the grant that was provided on 13 August 2021.  No email response or signature was received.

Best,
Nathan

Nathan Richards



phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman"
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning! Per our conversation, please send Andrew his Stock Option Grant that you
provided to him on 13 August 2021. As you know, Andrew didn't respond to your email, nor
did he sign the documents. Once he executes the document, I will be prepared to
countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard
Chief Human Resources Officer
Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #15
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

**PHLOW CORP.**

**2020 STOCK OPTION PLAN**

**<u>AMENDED AND RESTATED</u>**

**<u>NOTICE OF STOCK OPTION GRANT</u>**

Andrew Stiles
95 Gordon St.
Charleston, SC 29403

You have been granted an option to purchase Common Stock of PHLOW CORP., a Delaware public benefit corporation (the "<u>Company</u>"), as follows:

| | |
|---|---|
| Date of Grant: | November 2, 2020 |
| Exercise Price Per Share: | $5.41, *<u>subject to</u>* Section 5(b) of the Stock Option Agreement* |
| | * You and the Company previously acknowledged that the Fair Market Value on the Date of Grant was determined by the Board using a reasonable application of a reasonable valuation method, and that the Board intended to obtain a third-party valuation of the Common Stock, valued as of the Date of Grant for purposes of Code section 409A (the "<u>409A Valuation</u>"). You and the Company agreed that, if the 409A valuation differed from the Fair Market Value as determined by the Board, the Company may require that this Agreement be amended to adjust the Exercise Price Per Share to reflect such valuation, and in such case, such amendment shall be effective immediately upon its presentation to you, and you shall be deemed a party to and bound by such amendment regardless whether you execute such amendment. This document is to inform you that 409A Valuation differed from the Fair Market Value as determined by the Board. Accordingly, the Company is providing you with an amended Agreement with the updated exercise price per share. |
| Total Number of Shares: | 100,000 |
| Total Exercise Price: | $541,000 |

| | |
|---|---|
| Type of Option: | 55,452 Shares Incentive Stock Option** |
| | 44,548 Shares Nonstatutory Stock Option** |

**maximum number of Shares granted as Incentive Stock Option as permitted under Code section 422, given Exercise Price Per Share, Vesting/Exercise Schedule, and any other Incentive Stock Options you have been granted; remainder Nonstatutory Stock Option.

| | |
|---|---|
| Expiration Date: | November 2, 2030 |
| Vesting Commencement Date: | September 1, 2020 |

Vesting/Exercise Schedule:

So long as your Continuous Service Status does not terminate (and provided that no vesting shall occur following the Termination Date (as defined in Section 5 of the Stock Option Agreement)), this Option shall vest and become exercisable in accordance with the following schedule: this Option shall vest and become exercisable with respect to twenty-five percent (25%) of the Total Number of Shares on September 1, 2021, and with respect to six and 25/100 percent (6.25%) the Total Number of Shares on the first day of each calendar quarter thereafter.

Notwithstanding the above, if a Corporate Transaction occurs pursuant to which this Option is to be terminated (in whole or in part), the vesting and exercisability of this Option shall accelerate such that this Option shall become vested and exercisable in full prior to the consummation of the Corporate Transaction at such time and on such conditions as the Company shall determine. The Company shall notify Optionee that this Option will terminate at least 5 days prior to the date on which this Option terminates.

In addition, if you are party to an employment agreement or other services agreement with the Company or a Subsidiary or an Affiliate that provides for accelerated vesting of this Option, accelerated vesting of this Option shall occur in accordance with such agreement.

Termination Period:

You may exercise this Option for one hundred twenty (120) days after the Termination Date *except as set out* in Section 5 of the Stock Option Agreement (but in no event later than the Expiration Date). You are responsible for keeping track of these exercise periods following the Termination Date. The Company will not provide further notice of such periods.

-2-

Transferability:             You may not transfer this Option except as set forth in Section 6 of the Stock Option Agreement.

*[Signature Page Follows]*

By your signature and the signature of the Company's representative or by accepting this grant, you and the Company agree that this Option is granted under and governed by the terms and conditions of this Notice and the 2020 Stock Option Plan and Option Agreement, both of which are attached to and made a part of this Notice.

In addition, you agree and acknowledge that your rights to any Shares underlying this Option will vest only as you provide services to the Company over time, that the grant of this Option is not as consideration for services you rendered to the Company prior to your date of hire, and that nothing in this Notice or the attached documents confers upon you any right to continue your employment or consulting relationship with the Company for any period of time, nor does it interfere in any way with your right or the Company's right to terminate that relationship at any time, for any reason, with or without cause, subject to Applicable Laws. Also, to the extent applicable, the Exercise Price Per Share has been set in good faith compliance with the applicable guidance issued by the IRS under Section 409A of the Code. However, there is no guarantee that the IRS will agree with the valuation, and by signing below, you agree and acknowledge that the Company, its Board, officers, employees, agents and stockholders shall not be held liable for any applicable costs, taxes, or penalties associated with this Option if, in fact, the IRS or any other person (including, without limitation, a successor corporation or an acquirer in a Change of Control or a Corporate Transaction) were to determine that this Option constitutes deferred compensation under Section 409A of the Code. You should consult with your own tax advisor concerning the tax consequences of such a determination by the IRS. For purposes of this paragraph, the term "Company" will be interpreted to include any Parent, Subsidiary or Affiliate.

**THE COMPANY:**

PHLOW CORP.

By:_____
                    (Signature)

Name:
Title:

**OPTIONEE:**

_____

ANDREW STILES

_____

(Signature)

Address:

95 Gordon St.
Charleston, SC 29403

-4-

# PHLOW CORP.

## 2020 STOCK OPTION PLAN

### OPTION AGREEMENT

1.    **Grant of Option.**  PHLOW CORP., a Delaware public benefit corporation (the "Company"), hereby grants to the person ("Optionee") named in the Notice of Stock Option Grant (the "Notice"), an option (the "Option") to purchase the total number of shares of Common Stock (the "Shares") set forth in the Notice, at the exercise price per Share set forth in the Notice (the "Exercise Price") subject to the terms, definitions and provisions of the 2020 PHLOW CORP. Stock Incentive Plan (the "Plan") adopted by the Company, which is incorporated in this Stock Option Agreement (this "Agreement") by reference.  Unless otherwise defined in this Agreement, the terms used in this Agreement or the Notice shall have the meanings defined in the Plan.

2.    **Designation of Option.**  This Option is intended to be an Incentive Stock Option as defined in Section 422 of the Code only to the extent so designated in the Notice, and to the extent it is not so designated or to the extent this Option does not qualify as an Incentive Stock Option, it is intended to be a Nonstatutory Stock Option.

Notwithstanding the above, if designated as an Incentive Stock Option, in the event that the Shares subject to this Option (and all other incentive stock options granted to Optionee by the Company or any Parent or Subsidiary, including under other plans) that first become exercisable in any calendar year have an aggregate fair market value (determined for each Share as of the date of grant of the option covering such Share) in excess of $100,000, the Shares in excess of $100,000 shall be treated as subject to a nonstatutory stock option, in accordance with Section 5(c) of the Plan.

3.    **Exercise of Option.**  This Option shall be exercisable during its term in accordance with the Vesting/Exercise Schedule set out in the Notice and with the provisions of Section 7(c) of the Plan as follows:

(a)    **Right to Exercise.**

(i)    This Option may not be exercised for a fraction of a share.

(ii)    In the event of Optionee's death, Disability or other termination of Continuous Service Status, the exercisability of this Option is governed by Section 5 below, subject to the limitations contained in this Section 3.

(iii)    In no event may this Option be exercised after the Expiration Date set forth in the Notice.

(b)    **Method of Exercise.**

(i)    This Option shall be exercisable by execution and delivery of the Exercise Agreement attached hereto as Exhibit A or of any other form of written notice approved

for such purpose by the Company which shall state Optionee's election to exercise this Option, the number of Shares in respect of which this Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required by the Company pursuant to the provisions of the Plan. Such written notice shall be signed by Optionee and shall be delivered to the Company by such means as are determined by the Company in its discretion to constitute adequate delivery. The written notice shall be accompanied by payment of the aggregate Exercise Price for the purchased Shares.

(ii)    As a condition to the grant, vesting and exercise of this Option and as further set forth in Section 9 of the Plan, Optionee hereby agrees to make adequate provision for the satisfaction of (and will indemnify the Company and any Subsidiary or Affiliate for) any applicable taxes or tax withholdings, social contributions, required deductions, or other payments, if any ("Tax-Related Items"), which arise upon the grant, vesting or exercise of this Option, disposition of Shares, receipt of dividends, if any, or otherwise in connection with this Option or the Shares, whether by withholding, direct payment to the Company, or otherwise as determined by the Company in its sole discretion. Regardless of any action the Company or any Subsidiary or Affiliate takes with respect to any or all applicable Tax-Related Items, Optionee acknowledges and agrees that the ultimate liability for all Tax-Related Items is and remains Optionee's responsibility and may exceed any amount actually withheld by the Company or any Subsidiary or Affiliate. Optionee further acknowledges and agrees that Optionee is solely responsible for filing all relevant documentation that may be required in relation to this Option or any Tax-Related Items other than filings or documentation that is the specific obligation of the Company or any Subsidiary or Affiliate pursuant to Applicable Law, such as but not limited to personal income tax returns or reporting statements in relation to the grant, vesting or exercise of this Option, the holding of Shares or any bank or brokerage account, the subsequent sale of Shares, and the receipt of any dividends. Optionee further acknowledges that the Company makes no representations or undertakings regarding the treatment of any Tax-Related Items and does not commit to and is under no obligation to structure the terms or any aspect of the Option to reduce or eliminate Optionee's liability for Tax-Related Items or achieve any particular tax result. Further, if Optionee has become subject to tax in more than one jurisdiction, Optionee acknowledges that the Company or any Subsidiary or Affiliate may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(iii)    The Company is not obligated, and will have no liability for failure, to issue or deliver any Shares upon exercise of this Option unless such issuance or delivery would comply with the Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel. Furthermore, Optionee understands that the Applicable Laws of the country in which Optionee is residing or working at the time of grant, vesting, and/or exercise of this Option (including any rules or regulations governing securities, foreign exchange, tax, labor or other matters) may restrict or prevent exercise of this Option. This Option may not be exercised until such time as the Plan has been approved by the holders of capital stock of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such Shares would constitute a violation of any Applicable Laws, including any applicable U.S. federal or state securities laws or any other law or regulation, including any rule under Part 221 of Title 12 of the Code of Federal Regulations as promulgated by the Federal Reserve Board. As a condition to the exercise of this Option, the Company may require Optionee to make any representation and warranty to the Company as may be required by the Applicable

-2-

Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Optionee on the date on which this Option is exercised with respect to such Shares.

(iv)    Subject to compliance with Applicable Laws, this Option shall be deemed to be exercised upon receipt by the Company of the appropriate written notice of exercise accompanied by the Exercise Price and the satisfaction of any applicable obligations described in Section 3(b)(ii) above.

4.    **Method of Payment.**  Payment of the Exercise Price shall be by cash or check or, following the initial public offering of the Company's Common Stock, by Cashless Exercise pursuant to which the Optionee delivers an irrevocable direction to a securities broker (on a form prescribed by the Company and according to a procedure established by the Company), or by such other methods allowed by the Plan if permitted in the Company's sole discretion.

Optionee understands and agrees that, if required by the Company to comply with Applicable Laws, any cross-border cash remittance made to exercise this Option or transfer proceeds received upon the sale of Shares must be made through a locally authorized financial institution or registered foreign exchange agency and may require Optionee to provide to such entity certain information regarding the transaction. Moreover, Optionee understands and agrees that the future value of the underlying Shares is unknown and cannot be predicted with certainty and may decrease in value, even below the Exercise Price. Optionee understands that neither the Company nor any Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between local currency and the United States Dollar or the selection by the Company or any Subsidiary or Affiliate in its sole discretion of an applicable foreign currency exchange rate that may affect the value of the Option (or the calculation of income or Tax-Related Items thereunder).

5.    **Termination of Relationship.**  Following the date of termination of Optionee's Continuous Service Status for any reason (the "Termination Date"), Optionee may exercise this Option only as set forth in the Notice and this Section 5. If Optionee does not exercise this Option within the Termination Period set forth in the Notice or the termination periods set forth below, this Option shall terminate in its entirety. In no event, may any Option be exercised after the Expiration Date of this Option as set forth in the Notice. For the avoidance of doubt and for purposes of this Option only, termination of Continuous Service Status and the Termination Date will be deemed to occur as of the date Optionee is no longer actively providing services as an Employee or Consultant (except to the extent Optionee is on a Company approved leave of absence) and will not be extended by any notice period or "garden leave" that is required contractually or under Applicable Laws.

(a)    **Termination for Good Reason or Not for Cause.**  In the event of termination of Optionee's Continuous Service Status for Good Reason (as defined below) or by the Company not for Cause the Option shall become fully vested on the Optionee's Termination Date and this Option may be exercised by the Optionee within one hundred twenty (120) days after the date on which the Optionee's Continuous Service terminated, but in any event no later than the Option Expiration Date. If the Optionee is a party to an employment, Change of Control, or other service agreement with the Company or a Subsidiary or Affiliate and such agreement provides for a definition of Good Reason, the definition contained in the agreement shall apply for purposes of this Section 5(a). In all other cases, Good Reason shall mean:

(i)  a material diminution in Optionee's authority, duties, or responsibilities; or

(ii)  a material reduction of Optionee's base salary, as the same may have been increased from time to time, other than a percentage reduction applicable generally to all or a significant number of the Company's employees;

provided that, in the case of either (i) or (ii), Good Reason shall not be deemed to exist unless the circumstances alleged to constitute Good Reason are not remedied by the Company within thirty (60) days of its receipt of a written notice from the Optionee describing the applicable circumstances (which notice must be provided by the Optionee within ninety (90) days of the initial occurrence of the applicable circumstances).

(b)    **Termination By Employee Without Good Reason.** In the event that the Optionee decides to terminate his Continuous Service Status without Good Reason, Optionee may, but only within sixty (60) days following the Termination Date, exercise this Option to the extent Optionee had become vested in the Optioned Stock as of the Termination Date. In such event, the vested portion of this Option will be exercisable at an increased exercise price equal to the average of: (i) the price per share of Common Stock in the most recent offering of Common Stock to one or more investors, as determined by the Company; and (ii) the price per share of Common Stock under the most recent valuation conducted for purposes of Code section 409A, provided such valuation is as of a date no more than 12 months prior to the Termination Date. Notwithstanding the preceding sentence, the exercise price shall in no event be less than the exercise price per Share set forth in the Notice (as adjusted, if applicable, under Section 9 of the Plan). The Option, to the extent unvested on the Termination Date, shall lapse.

(c)    **Termination upon Disability of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's Disability (or, if Optionee is party to an employment agreement with the Company or a Subsidiary of Affiliate, Optionee's "disability" as defined in such employment agreement), Optionee may, but only within one hundred twenty (120) days following the Termination Date, exercise this Option to the extent Optionee had become vested in the Optioned Stock as of the Termination Date.

(d)    **Death of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's death, or in the event of Optionee's death within 3 months following Optionee's Termination Date, this Option may be exercised at any time within 12 months following the Termination Date, or if later, one hundred twenty (120) days following the date of death by any beneficiaries designated in accordance with Section 15 of the Plan or, if there are no such beneficiaries, by the Optionee's estate, or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent Optionee had become vested in the Optioned Stock as of the Termination Date.

(e)    **Termination for Cause.** In the event of termination of Optionee's Continuous Service Status for Cause, this Option (including any vested portion thereof) shall immediately terminate in its entirety upon notification to Optionee of such termination for Cause. If Optionee's Continuous Service Status is suspended pending an investigation of whether Optionee's Continuous Service Status will be terminated for Cause, all Optionee's rights under

-4-

this Option, including the right to exercise this Option, shall be suspended during the investigation period.

6.  **Non-Transferability of Option; Stockholders Agreement.**

(a)     This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by him or her.  The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of Optionee.

(b)     As a condition precedent to entering into this Agreement, at the request of the Company, Optionee shall become a party to any stockholders agreement to which the Company is a party at the time of Optionee's execution and delivery of this Agreement, or to which the holders of at least 50% of the outstanding shares of Common Stock may become parties after Optionee's execution and delivery of this Agreement, in each case as such stockholders agreement may be amended from time to time (the "Stockholders Agreement"), by executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to the terms of the Stockholders Agreement as a "Stockholder," if and as such term may be defined in the Stockholders Agreement.

7.     **Lock-Up Agreement.**  If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Optionee shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Optionee shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

8.     **Effect of Agreement.**  Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof (and has had an opportunity to consult counsel regarding the Option terms), and hereby accepts this Option and agrees to be bound by its contractual terms as set forth herein and in the Plan.  Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Administrator regarding any questions relating to this Option.  In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of the Notice and this Agreement, the Plan terms and provisions shall prevail.

9.     **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on Optionee's participation in the Plan, on the Option and on any Award or Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with Applicable Laws or facilitate the administration of the Plan.  Optionee agrees to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.  Furthermore, Optionee acknowledges that the laws of the country in which Optionee is working at the time of grant, vesting and exercise of the Option or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign

exchange, tax, labor, or other matters) may subject Optionee to additional procedural or regulatory requirements that Optionee is and will be solely responsible for and must fulfill.

10. **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to Optionee's current or future participation in the Plan, this Option, the Shares subject to this Option, any other Company Securities or any other Company-related documents, by electronic means. Optionee hereby (i) consents to receive such documents by electronic means, (ii) consents to the use of electronic signatures, and (iii) if applicable, agrees to participate in the Plan and/or receive any such documents through an on-line or electronic system established and maintained by the Company or a third party designated by the Company. To the extent Optionee has been provided with a copy of this Agreement, the Plan, or any other documents relating to this Option in a language other than English, the English language documents will prevail in case of any ambiguities or divergences as a result of translation.

11. **No Acquired Rights.** In accepting the Option, Optionee acknowledges that the Plan is established voluntarily by the Company, is discretionary in nature, and may be modified, amended, suspended or terminated by the Company at any time. The grant of the Option is voluntary and occasional and does not create any contractual or other right to receive future grants of Options, other Awards or benefits in lieu of Options, even if Options have been granted repeatedly in the past, and all decisions with respect to future grants of Options or other Awards, if any, will be at the sole discretion of the Company. In addition, Optionee's participation in the Plan is voluntary, and the Option and the Shares subject to the Option are extraordinary items that do not constitute regular compensation for services rendered to the Company or any Subsidiary or Affiliate and are outside the scope of Optionee's employment contract, if any. The Option and the Shares subject to the Option are not intended to replace any pension rights or compensation and are not part of normal or expected salary or compensation for any purpose, including but not limited to calculating severance payments, if any, upon termination.

12. **Data Privacy.** *Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Optionee's personal data (as described below) by and among, as applicable, the Company and any Subsidiary or Affiliate for the exclusive purpose of implementing, administering, and managing Optionee's participation in the Plan. Optionee understands that refusal or withdrawal of consent may affect Optionee's ability to participate in the Plan or to realize benefits from the Option.*

*Optionee understands that the Company and any Subsidiary or Affiliate may hold certain personal information about Optionee, including, but not limited to, Optionee's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company or any Subsidiary or Affiliate, details of all Options or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in Optionee's favor ("Personal Data"). Optionee understands that Personal Data may be transferred to any Subsidiary or Affiliate or third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in the United States, Optionee's country, or elsewhere, and that the recipient's country may have different data privacy laws and protections than Optionee's country.*

13.      **Miscellaneous.**

        (a)      **Governing Law.**      The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

        (b)      **Entire Agreement.**   This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

        (c)      **Amendments and Waivers.**   No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.   No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

        (d)      **Successors and Assigns.**   Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.   The Company may assign any of its rights and obligations under this Agreement.   No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

        (e)      **Notices.**   Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

        (f)      **Severability.**   If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

        (g)      **Construction.**   This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

        (h)      **Counterparts.**   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all

of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

## EXHIBIT A

## PHLOW CORP.

## 2020 STOCK OPTION PLAN

## EXERCISE AGREEMENT

This Exercise Agreement (this "Agreement") is made as of _____, by and between PHLOW CORP., a Delaware public benefit corporation (the "Company"), and _____ ("Purchaser").  To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the PHLOW CORP. 2020 Stock Option Plan (the "Plan") and the Option Agreement (as defined below).

1.     **Exercise of Option.**  Subject to the terms and conditions hereof, Purchaser hereby elects to exercise his or her option to purchase _____ shares of the Common Stock (the "Shares") of the Company under and pursuant to the Plan, the Notice of Stock Option Grant and the Stock Option Agreement granted _____ (the "Option Agreement").  The purchase price for the Shares shall be $_____ per Share for a total purchase price of $_____.  The term "Shares" refers to the purchased Shares and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.     **Time and Place of Exercise.**  The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution and delivery of this Agreement, the payment of the aggregate exercise price by any method listed in Section 4 of the Option Agreement, and the satisfaction of any applicable tax, withholding, required deductions or other payments, all in accordance with the provisions of Section 3(b) of the Option Agreement.  The Company shall issue the Shares to Purchaser by entering such Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company, against payment of the exercise price therefor by Purchaser.  The Company will deliver to Purchaser a stock certificate or, in the case of uncertificated securities upon request, a notice of issuance, for the Shares as soon as practicable following such date.

3.     **Call Option.**  The Shares are subject to any and all limitations on transfer created by the transfer restrictions set forth in the Stockholders Agreement and Applicable Law, and Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions thereof.  In addition, subject to the terms of this Section, if the Optionee's employment with the Company terminates or expires for any reason or without cause, the Company shall have the option (the "Call Option"), but not the obligation, to purchase any or all Shares that (x) are subject to purchase by Optionee pursuant to the Option Agreement on the date of termination or expiration of Optionee's employment with the Company and are purchased after such termination or expiration date or (y) were purchased at any time prior to the termination or expiration of the Optionee's employment.  The purchase price per share of the Call Option shall

be the greater of (i) Fair Market Value as of termination of employment, (ii) the purchase price per Share set forth in Section 1 of this Agreement, and (iii) the exercise price per share set forth in the last incentive stock option, if any, issued by the Company during the three (3) month period immediately preceding termination of employment.  The purchase price shall be payable in cash at closing.  The Call Option shall be exercised by written notice by the Company to the Optionee (the "Call Notice") within 90 days after the later of (i) the date of termination or expiration of Optionee's employment with the Company or (ii) the date of acquisition by the Optionee of Shares that is subject to the Call Option.  The closing of the Call Option shall occur within 90 days after the date of the Call Notice and shall take place at the Company's principal office.  If the Optionee fails to deliver the Shares identified in the Call Notice duly endorsed for transfer to the Company at such closing, then all rights with respect to such Shares, including, without limitation, any right to vote or receive dividends with respect to such Shares, shall forthwith after such closing terminate, except only the right of the holder to receive the payment described above, without interest, upon surrender of their certificate or certificates therefor.

4.     **Investment and Taxation Representations.**  In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)     Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.  Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law.  Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b)     Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)     Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d)     Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.  Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions.  Notwithstanding this Section 4(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 4(e) below.

(e)     Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)     Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as <u>Annex I</u>).

(g)     Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

## 5.     **Restrictive Legends and Stop-Transfer Orders.**

(a)     **Legends.** Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares shall bear the following legends (as well as any legends set forth in the Stockholders Agreement or required by the Company or applicable state and federal corporate and securities laws):

> THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

> THE SECURITIES REFERENCED HEREIN ARE SUBJECT TO A CALL OPTION IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

(b)     **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

6.  **No Employment Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, Subsidiary or Affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.  **Waiver of Statutory Information Rights.**  Purchaser acknowledges and understands that, but for the waiver made herein, Purchaser would be entitled, upon written demand under oath stating the purpose thereof, to inspect for any proper purpose, and to make copies and extracts from, the Company's stock ledger, a list of its stockholders, and its other books and records, and the books and records of subsidiaries of the Company, if any, under the circumstances and in the manner provided in Section 220 of the Delaware General Corporation Law (any and all such rights, and any and all such other rights of Purchaser as may be provided for in Section 220, the "Inspection Rights").  In light of the foregoing, until the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, Purchaser hereby unconditionally and irrevocably waives the Inspection Rights, whether such Inspection Rights would be exercised or pursued directly or indirectly pursuant to Section 220 or otherwise, and covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights.  The foregoing waiver applies to the Inspection Rights of Purchaser in Purchaser's capacity as a stockholder and shall not affect any rights of a director, in his or her capacity as such, under Section 220.  The foregoing waiver shall not apply to any contractual inspection rights of Purchaser under any written agreement with the Company.

8.  **Miscellaneous.**

(a)  **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b)  **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)  **Amendments and Waivers.**  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)  **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this

Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h) **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

(i) **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

*[Signature Page Follows]*

The parties have executed this Exercise Agreement as of the date first set forth above.

**THE COMPANY:**

PHLOW CORP.

By:_____
              (Signature)

Name:
Title:

Address:

**PURCHASER:**

_____
(PRINT NAME)

_____
(Signature)

Address:

_____
_____
_____
Email:_____

-6-

**ANNEX I**

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

(3) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

| | |
|---|---|
| **From:** | Heidi Dillard |
| **To:** | Andrew Stiles |
| **Cc:** | Nathan Richards; Mark A. Berman; Kim Daniel |
| **Subject:** | Re: A. Stiles - Stock Option Grant Documents |
| **Date:** | Monday, December 13, 2021 9:19:55 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Andrew,

Thank you so much for your note.  We apologize for the slightly delayed response; we were dealing with other important matters and our board meeting last week.

First and foremost, we do not dispute your time at Phlow nor your stock option grant.  Our stance is that we never received your signed paperwork – did you send it?  I also do not believe Nathan "forgot" to send you documents.  As you know from your work with him during the past 19 months, he is incredibly contentious.  I'll circle up with Nathan to discuss updated documents and revert in a timely manner (as you know, we utilize outside counsel for these tasks).  We'll also provide any necessary payment (probably by wire) instructions, if necessary.

As you know, given our limited staff resources, we need to prioritize our work accordingly.  Since, as you mention, you are still a Phlow employee, we didn't deem your email correspondence as URGENT and CRITICAL to warrant an IMMEDIATE response.  Given your experience and government contracting expertise, I know you understand that we needed to deal with other critical vendor and board materials.  Unlike when we prioritized getting your daughter enrolled in healthcare after you missed the enrollment deadline (we dropped everything else to make sure we could get her coverage).

Have a great day!

Best,

Heidi

**From:** Andrew Stiles <jandrew.stiles@gmail.com>
**Date:** Monday, December 13, 2021 at 7:57 AM
**To:** Heidi Dillard <hdillard@phlow-usa.com>
**Cc:** Nathan Richards <nrichards@phlow-usa.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you know the content is safe.

Heidi/Nathan,

If yall sent any needed documents on Friday, I did not receive them. Please advise. As of today, December 13, 2021, I am still a Phlow employee. Nathan has worked with all other employees to handle any needed administrative paperwork for the stock option plans. I am sure it is not your intent to show me disparate treatment.

Thanks,
Andrew

On Thu, Dec 9, 2021 at 2:32 PM Andrew Stiles <jandrew.stiles@gmail.com> wrote:

Heidi,

I do not understand how or why this has become problematic. I did not agree to the "alternate" vesting schedule...so the original vesting schedule should be in place. The original stock option plan had 25% vesting on 9/1/20 and then 6.25% every quarter thereafter. If Nathan should have sent me a new set of documents then I guess he forgot. That is ok, just send them over now and I will sign. Or is it Phlow's position that I have no vested stock options despite 19+ months of service time?

Thanks,
Andrew

On Thu, Dec 9, 2021 at 12:56 PM Heidi Dillard <hdillard@phlow-usa.com> wrote:

Andrew,

Thank you for your note. While it is accurate you called Nathan the next week after his August 13 email to you, it was not clear to him that you wanted the "alternate" vesting nor does he recall telling you to not sign the Amended and Restated version. If those things occurred, Nathan would have delivered a new set of documents to you to execute (which is how he was handling the process). In addition, there is no record of you following up for additional documents. However, if you will please provide any documents or correspondence where you followed up with Nathan on this matter, I will be glad to review the same. We also certainly can search through your email correspondence as well.

Best,

Heidi

**From:** Andrew Stiles <jandrew.stiles@gmail.com>
**Date:** Wednesday, December 8, 2021 at 4:00 PM

**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Heidi Dillard <hdillard@phlow-usa.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

> **CAUTION:** This email originated from outside of the organization. Do not follow guidance, click
> links, or open attachments unless you know the content is safe.

Hi Nathan & Heidi,

Nathan sent the attached email on August 13, 2021 which included the *Amended and Restated
Notice of Stock Option Grant* and highlighted the "alternate" vesting schedule which
pushed the first vesting tranche back to January 1, 2022 from the original planned date of
September 1, 2021. Per Nathan's request in the email, I called him the following week to
discuss the "alternate" vesting schedule. On that call, I made it clear I did not want the
"alternate" vesting schedule , and instead, wanted to keep the planned vesting schedule from
the original agreement with the first 25% tranche vesting September 1, 2021. As such, Nathan
told me not to sign the *Amended and Restated* version sent August 13 which is why I did not
return it with signature.

Please advise.

Thanks,
Andrew

On Wed, Dec 8, 2021 at 1:06 PM Nathan Richards <nrichards@phlow-usa.com> wrote:

All,

Attached is copy of the grant that was provided on 13 August 2021.  No email response or
signature was received.

Best,
Nathan

_____

Nathan Richards
Director of Accounting
E   804 297 4893
M  804 593 5087



1001 Haxall Point #1B
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified**[TM]!
Click here to learn what makes our company culture great.

---

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman" <mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email, nor did he sign the documents.  Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard
Chief Human Resources Officer
Phlow Corporation

804.774.0344 (m)



1001 Haxall Point #18
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

| From: | Andrew Stiles |
|---|---|
| To: | Heidi Dillard |
| Cc: | Nathan Richards; Mark A. Berman; Kim Daniel |
| Subject: | Re: A. Stiles - Stock Option Grant Documents |
| Date: | Monday, December 13, 2021 7:57:15 AM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Heidi/Nathan,

If yall sent any needed documents on Friday, I did not receive them. Please advise. As of today, December 13, 2021, I am still a Phlow employee. Nathan has worked with all other employees to handle any needed administrative paperwork for the stock option plans. I am sure it is not your intent to show me disparate treatment.

Thanks,
Andrew

On Thu, Dec 9, 2021 at 2:32 PM Andrew Stiles <jandrew.stiles@gmail.com> wrote:
Heidi,

I do not understand how or why this has become problematic. I did not agree to the "alternate" vesting schedule...so the original vesting schedule should be in place. The original stock option plan had 25% vesting on 9/1/20 and then 6.25% every quarter thereafter. If Nathan should have sent me a new set of documents then I guess he forgot. That is ok, just send them over now and I will sign. Or is it Phlow's position that I have no vested stock options despite 19+ months of service time?

Thanks,
Andrew

On Thu, Dec 9, 2021 at 12:56 PM Heidi Dillard <hdillard@phlow-usa.com> wrote:

Andrew,


Thank you for your note. While it is accurate you called Nathan the next week after his August 13 email to you, it was not clear to him that you wanted the "alternate" vesting nor does he recall telling you to not sign the Amended and Restated version. If those things occurred, Nathan would have delivered a new set of documents to you to execute (which is how he was handling the process). In addition, there is no record of you following up for additional documents. However, if you will please provide any documents or correspondence where you followed up with Nathan on this matter, I will be glad to review the same. We also certainly can search through your email correspondence as well.

Best,


Heidi


**From:** Andrew Stiles <jandrew.stiles@gmail.com>
**Date:** Wednesday, December 8, 2021 at 4:00 PM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Heidi Dillard <hdillard@phlow-usa.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

**CAUTION:** This email originated from outside of the organization. Do not follow
guidance, click links, or open attachments unless you know the content is safe.


Hi Nathan & Heidi,


Nathan sent the attached email on August 13, 2021 which included the *Amended and Restated
Notice of Stock Option Grant* and highlighted the "alternate" vesting schedule which pushed the
first vesting tranche back to January 1, 2022 from the original planned date of September 1,
2021. Per Nathan's request in the email, I called him the following week to discuss the
"alternate" vesting schedule. On that call, I made it clear I did not want the "alternate" vesting
schedule , and instead, wanted to keep the planned vesting schedule from the original agreement
with the first 25% tranche vesting September 1, 2021. As such, Nathan told me not to sign the
*Amended and Restated* version sent August 13 which is why I did not return it with signature.


Please advise.


Thanks,

Andrew


On Wed, Dec 8, 2021 at 1:06 PM Nathan Richards <nrichards@phlow-usa.com> wrote:

    All,

Attached is copy of the grant that was provided on 13 August 2021.  No email response or signature was received.


Best,

Nathan

_____

**Nathan Richards**
Director of Accounting
O   804.207.4893

M   804.683.5087




1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com


 



**We're Great Place to Work Certified**™!
Click here to learn what makes our company culture great.


**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman"

<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email, nor did he sign the documents.  Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard

Chief Human Resources Officer

Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

| From: | Andrew Stiles |
|---|---|
| To: | Heidi Dillard |
| Cc: | Nathan Richards; Mark A. Berman; Kim Daniel |
| Subject: | Re: A. Stiles - Stock Option Grant Documents |
| Date: | Thursday, December 9, 2021 2:32:00 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Heidi,

I do not understand how or why this has become problematic. I did not agree to the "alternate" vesting schedule...so the original vesting schedule should be in place. The original stock option plan had 25% vesting on 9/1/20 and then 6.25% every quarter thereafter. If Nathan should have sent me a new set of documents then I guess he forgot. That is ok, just send them over now and I will sign. Or is it Phlow's position that I have no vested stock options despite 19+ months of service time?

Thanks,
Andrew

On Thu, Dec 9, 2021 at 12:56 PM Heidi Dillard <hdillard@phlow-usa.com> wrote:

Andrew,


Thank you for your note. While it is accurate you called Nathan the next week after his August 13 email to you, it was not clear to him that you wanted the "alternate" vesting nor does he recall telling you to not sign the Amended and Restated version. If those things occurred, Nathan would have delivered a new set of documents to you to execute (which is how he was handling the process). In addition, there is no record of you following up for additional documents. However, if you will please provide any documents or correspondence where you followed up with Nathan on this matter, I will be glad to review the same. We also certainly can search through your email correspondence as well.


Best,


Heidi



**From:** Andrew Stiles <jandrew.stiles@gmail.com>

**Date:** Wednesday, December 8, 2021 at 4:00 PM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Heidi Dillard <hdillard@phlow-usa.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

**CAUTION:** This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you know the content is safe.

Hi Nathan & Heidi,

Nathan sent the attached email on August 13, 2021 which included the *Amended and Restated Notice of Stock Option Grant* and highlighted the "alternate" vesting schedule which pushed the first vesting tranche back to January 1, 2022 from the original planned date of September 1, 2021. Per Nathan's request in the email, I called him the following week to discuss the "alternate" vesting schedule. On that call, I made it clear I did not want the "alternate" vesting schedule , and instead, wanted to keep the planned vesting schedule from the original agreement with the first 25% tranche vesting September 1, 2021. As such, Nathan told me not to sign the *Amended and Restated* version sent August 13 which is why I did not return it with signature.

Please advise.

Thanks,

Andrew

On Wed, Dec 8, 2021 at 1:06 PM Nathan Richards <nrichards@phlow-usa.com> wrote:

All,

Attached is copy of the grant that was provided on 13 August 2021. No email response or signature was received.

Best,

Nathan



**Nathan Richards**
Director of Accounting
O    804.207.4893

M    804.683.5087



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com

in



**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

---

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman"
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents


Nathan,


Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you
provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email, nor
did he sign the documents.  Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard

Chief Human Resources Officer

Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com





We're Great Place to Work Certified™!
Click here to learn what makes our company culture great.

| | |
|---|---|
| **From:** | Heidi Dillard |
| **To:** | Andrew Stiles; Nathan Richards |
| **Cc:** | Mark A. Berman; Kim Daniel |
| **Subject:** | Re: A. Stiles - Stock Option Grant Documents |
| **Date:** | Thursday, December 9, 2021 12:56:14 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Andrew,

Thank you for your note.  While it is accurate you called Nathan the next week after his August 13 email to you, it was not clear to him that you wanted the "alternate" vesting nor does he recall telling you to not sign the Amended and Restated version.  If those things occurred, Nathan would have delivered a new set of documents to you to execute (which is how he was handling the process).  In addition, there is no record of you following up for additional documents.  However, if you will please provide any documents or correspondence where you followed up with Nathan on this matter, I will be glad to review the same.  We also certainly can search through your email correspondence as well.

Best,

Heidi

---

**From:** Andrew Stiles <jandrew.stiles@gmail.com>
**Date:** Wednesday, December 8, 2021 at 4:00 PM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Heidi Dillard <hdillard@phlow-usa.com>, Mark A. Berman <mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

> **CAUTION:** This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you know the content is safe.

Hi Nathan & Heidi,

Nathan sent the attached email on August 13, 2021 which included the *Amended and Restated Notice of Stock Option Grant* and highlighted the "alternate" vesting schedule which pushed the first vesting tranche back to January 1, 2022 from the original planned date of September 1, 2021. Per Nathan's request in the email, I called him the following week to discuss the "alternate" vesting schedule. On that call, I made it clear I did not want the "alternate" vesting schedule , and instead, wanted to keep the planned vesting schedule from the original agreement with the first 25% tranche vesting September 1, 2021. As such, Nathan told me not to sign the *Amended and Restated* version

sent August 13 which is why I did not return it with signature.

Please advise.

Thanks,
Andrew

On Wed, Dec 8, 2021 at 1:06 PM Nathan Richards <nrichards@phlow-usa.com> wrote:

> All,
>
> Attached is copy of the grant that was provided on 13 August 2021.  No email response or
> signature was received.
>
> Best,
> Nathan
>
> _____
> **Nathan Richards**
> Director of Accounting
> O   804.207.4893
> M  804.683.5087



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com

 

 **We're Great Place to Work** Certified™!
Click here to learn what makes our company culture great.

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman"
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>

**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email, nor did he sign the documents.  Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard
Chief Human Resources Officer
Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #18
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

| From: | Andrew Stiles |
|---|---|
| To: | nrichards@phlow-usa.com |
| Cc: | Heidi Dillard; Mark A. Berman; Kim Daniel |
| Subject: | Re: A. Stiles - Stock Option Grant Documents |
| Date: | Wednesday, December 8, 2021 3:57:31 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |
| | Phlow Stock Option Paperwork.eml (233 KB).msg |

Hi Nathan & Heidi,

Nathan sent the attached email on August 13, 2021 which included the *Amended and Restated Notice of Stock Option Grant* and highlighted the "alternate" vesting schedule which pushed the first vesting tranche back to January 1, 2022 from the original planned date of September 1, 2021. Per Nathan's request in the email, I called him the following week to discuss the "alternate" vesting schedule. On that call, I made it clear I did not want the "alternate" vesting schedule , and instead, wanted to keep the planned vesting schedule from the original agreement with the first 25% tranche vesting September 1, 2021. As such, Nathan told me not to sign the *Amended and Restated* version sent August 13 which is why I did not return it with signature.

Please advise.

Thanks,
Andrew

On Wed, Dec 8, 2021 at 1:06 PM Nathan Richards <nrichards@phlow-usa.com> wrote:

> All,
>
>
> Attached is copy of the grant that was provided on 13 August 2021.  No email response or signature was received.
>
>
> Best,
>
> Nathan

---

**Nathan Richards**
Director of Accounting
O   804.207.4893

M  804.683.5087



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

---

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman"
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you
provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email,
nor did he sign the documents.  Once he executes the document, I will be prepared to
countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard

Chief Human Resources Officer

Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com



 **We're Great Place to Work Certified**™!
Click here to learn what makes our company culture great.

| | |
|---|---|
| **From:** | Heidi Dillard |
| **To:** | Nathan Richards |
| **Cc:** | Andrew Stiles; Mark A. Berman; Kim Daniel |
| **Subject:** | Re: A. Stiles - Stock Option Grant Documents |
| **Date:** | Wednesday, December 8, 2021 1:12:53 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Thank you, Nathan.

**From:** Nathan Richards <nrichards@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 1:06 PM
**To:** Heidi Dillard <hdillard@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, Mark A. Berman
<mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: A. Stiles - Stock Option Grant Documents

All,

Attached is copy of the grant that was provided on 13 August 2021.  No email response or signature
was received.

Best,
Nathan

Nathan Richards
Director of Accounting
O  804.207.4893
M  804.683.5087



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>
**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman" <mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email, nor did he sign the documents.  Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard
Chief Human Resources Officer
Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

| **From:** | Nathan Richards |
| **To:** | Heidi Dillard |
| **Cc:** | Andrew Stiles; Mark A. Berman; Kim Daniel |
| **Subject:** | Re: A. Stiles - Stock Option Grant Documents |
| **Date:** | Wednesday, December 8, 2021 1:06:29 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |
| | Nov 2020 - Amended and Restated - Stock Option-Stiles[3].DOCX |

All,

Attached is copy of the grant that was provided on 13 August 2021. No email response or signature was received.

Best,
Nathan

---

**Nathan Richards**
Director of Accounting
O   804.207.4893
M   804.683.5087



1001 Haxall Point, #1B
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

---

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Wednesday, December 8, 2021 at 11:45 AM
**To:** Nathan Richards <nrichards@phlow-usa.com>

**Cc:** Andrew Stiles <jandrew.stiles@gmail.com>, "Mark A. Berman" <mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** A. Stiles - Stock Option Grant Documents

Nathan,

Good morning!  Per our conversation, please send Andrew his Stock Option Grant that you provided to him on 13 August 2021.  As you know, Andrew didn't respond to your email, nor did he sign the documents.  Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard
Chief Human Resources Officer
Phlow Corporation

804.774.0344 (m)



1001 Haxall Point, #18
Richmond, VA 23219
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

**PHLOW CORP.**

**2020 STOCK OPTION PLAN**

**<u>AMENDED AND RESTATED</u>**

**<u>NOTICE OF STOCK OPTION GRANT</u>**

Andrew Stiles
95 Gordon St.
Charleston, SC 29403

You have been granted an option to purchase Common Stock of PHLOW CORP., a Delaware public benefit corporation (the "<u>Company</u>"), as follows:

| | |
|---|---|
| Date of Grant: | November 2, 2020 |
| Exercise Price Per Share: | $5.41, *<u>subject to</u>* Section 5(b) of the Stock Option Agreement* |
| | * You and the Company previously acknowledged that the Fair Market Value on the Date of Grant was determined by the Board using a reasonable application of a reasonable valuation method, and that the Board intended to obtain a third-party valuation of the Common Stock, valued as of the Date of Grant for purposes of Code section 409A (the "<u>409A Valuation</u>"). You and the Company agreed that, if the 409A valuation differed from the Fair Market Value as determined by the Board, the Company may require that this Agreement be amended to adjust the Exercise Price Per Share to reflect such valuation, and in such case, such amendment shall be effective immediately upon its presentation to you, and you shall be deemed a party to and bound by such amendment regardless whether you execute such amendment. This document is to inform you that 409A Valuation differed from the Fair Market Value as determined by the Board. Accordingly, the Company is providing you with an amended Agreement with the updated exercise price per share. |
| Total Number of Shares: | 100,000 |
| Total Exercise Price: | $541,000 |

| Type of Option: | 74,734 Shares Incentive Stock Option** |
| | 25,266 Shares Nonstatutory Stock Option** |

**maximum number of Shares granted as Incentive Stock Option as permitted under Code section 422, given Exercise Price Per Share, Vesting/Exercise Schedule, and any other Incentive Stock Options you have been granted; remainder Nonstatutory Stock Option.

| Expiration Date: | November 2, 2030 |
| Vesting Commencement Date: | September 1, 2020 |
| Vesting/Exercise Schedule: | So long as your Continuous Service Status does not terminate (and provided that no vesting shall occur following the Termination Date (as defined in Section 5 of the Stock Option Agreement)), this Option shall vest and become exercisable in accordance with the following schedule: this Option shall vest and become exercisable with respect to twenty-five percent (25%) of the Total Number of Shares on <u>January 1, 2022,</u> and with respect to six and 25/100 percent (6.25%) the Total Number of Shares on the first day of each calendar quarter thereafter. |

Notwithstanding the above, if a Corporate Transaction occurs pursuant to which this Option is to be terminated (in whole or in part), the vesting and exercisability of this Option shall accelerate such that this Option shall become vested and exercisable in full prior to the consummation of the Corporate Transaction at such time and on such conditions as the Company shall determine. The Company shall notify Optionee that this Option will terminate at least 5 days prior to the date on which this Option terminates.

In addition, if you are party to an employment agreement or other services agreement with the Company or a Subsidiary or an Affiliate that provides for accelerated vesting of this Option, accelerated vesting of this Option shall occur in accordance with such agreement.

| Termination Period: | You may exercise this Option for one hundred twenty (120) days after the Termination Date <u>*except as set out*</u> in Section 5 of the Stock Option Agreement (but in no event later than the Expiration Date). You are responsible for keeping track of these exercise periods following the Termination Date. The Company will not provide further notice of such periods. |

Transferability:      You may not transfer this Option except as set forth in Section 6 of the Stock Option Agreement.

*[Signature Page Follows]*

By your signature and the signature of the Company's representative or by accepting this grant, you and the Company agree that this Option is granted under and governed by the terms and conditions of this Notice and the 2020 Stock Option Plan and Option Agreement, both of which are attached to and made a part of this Notice.

In addition, you agree and acknowledge that your rights to any Shares underlying this Option will vest only as you provide services to the Company over time, that the grant of this Option is not as consideration for services you rendered to the Company prior to your date of hire, and that nothing in this Notice or the attached documents confers upon you any right to continue your employment or consulting relationship with the Company for any period of time, nor does it interfere in any way with your right or the Company's right to terminate that relationship at any time, for any reason, with or without cause, subject to Applicable Laws. Also, to the extent applicable, the Exercise Price Per Share has been set in good faith compliance with the applicable guidance issued by the IRS under Section 409A of the Code. However, there is no guarantee that the IRS will agree with the valuation, and by signing below, you agree and acknowledge that the Company, its Board, officers, employees, agents and stockholders shall not be held liable for any applicable costs, taxes, or penalties associated with this Option if, in fact, the IRS or any other person (including, without limitation, a successor corporation or an acquirer in a Change of Control or a Corporate Transaction) were to determine that this Option constitutes deferred compensation under Section 409A of the Code. You should consult with your own tax advisor concerning the tax consequences of such a determination by the IRS. For purposes of this paragraph, the term "Company" will be interpreted to include any Parent, Subsidiary or Affiliate.

**THE COMPANY:**

PHLOW CORP.

By:_____
                    (Signature)

Name:
Title:

**OPTIONEE:**

_____

ANDREW STILES

_____
(Signature)

Address:

95 Gordon St.
Charleston, SC 29403

-4-

# PHLOW CORP.

## 2020 STOCK OPTION PLAN

### OPTION AGREEMENT

1.    **Grant of Option.**  PHLOW CORP., a Delaware public benefit corporation (the "Company"), hereby grants to the person ("Optionee") named in the Notice of Stock Option Grant (the "Notice"), an option (the "Option") to purchase the total number of shares of Common Stock (the "Shares") set forth in the Notice, at the exercise price per Share set forth in the Notice (the "Exercise Price") subject to the terms, definitions and provisions of the 2020 PHLOW CORP. Stock Incentive Plan (the "Plan") adopted by the Company, which is incorporated in this Stock Option Agreement (this "Agreement") by reference.  Unless otherwise defined in this Agreement, the terms used in this Agreement or the Notice shall have the meanings defined in the Plan.

2.    **Designation of Option.**  This Option is intended to be an Incentive Stock Option as defined in Section 422 of the Code only to the extent so designated in the Notice, and to the extent it is not so designated or to the extent this Option does not qualify as an Incentive Stock Option, it is intended to be a Nonstatutory Stock Option.

Notwithstanding the above, if designated as an Incentive Stock Option, in the event that the Shares subject to this Option (and all other incentive stock options granted to Optionee by the Company or any Parent or Subsidiary, including under other plans) that first become exercisable in any calendar year have an aggregate fair market value (determined for each Share as of the date of grant of the option covering such Share) in excess of $100,000, the Shares in excess of $100,000 shall be treated as subject to a nonstatutory stock option, in accordance with Section 5(c) of the Plan.

3.    **Exercise of Option.**  This Option shall be exercisable during its term in accordance with the Vesting/Exercise Schedule set out in the Notice and with the provisions of Section 7(c) of the Plan as follows:

        (a)    **Right to Exercise.**

                (i)    This Option may not be exercised for a fraction of a share.

                (ii)    In the event of Optionee's death, Disability or other termination of Continuous Service Status, the exercisability of this Option is governed by Section 5 below, subject to the limitations contained in this Section 3.

                (iii)    In no event may this Option be exercised after the Expiration Date set forth in the Notice.

        (b)    **Method of Exercise.**

                (i)    This Option shall be exercisable by execution and delivery of the Exercise Agreement attached hereto as Exhibit A or of any other form of written notice approved

for such purpose by the Company which shall state Optionee's election to exercise this Option, the number of Shares in respect of which this Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required by the Company pursuant to the provisions of the Plan. Such written notice shall be signed by Optionee and shall be delivered to the Company by such means as are determined by the Company in its discretion to constitute adequate delivery. The written notice shall be accompanied by payment of the aggregate Exercise Price for the purchased Shares.

        (ii)    As a condition to the grant, vesting and exercise of this Option and as further set forth in Section 9 of the Plan, Optionee hereby agrees to make adequate provision for the satisfaction of (and will indemnify the Company and any Subsidiary or Affiliate for) any applicable taxes or tax withholdings, social contributions, required deductions, or other payments, if any ("Tax-Related Items"), which arise upon the grant, vesting or exercise of this Option, disposition of Shares, receipt of dividends, if any, or otherwise in connection with this Option or the Shares, whether by withholding, direct payment to the Company, or otherwise as determined by the Company in its sole discretion. Regardless of any action the Company or any Subsidiary or Affiliate takes with respect to any or all applicable Tax-Related Items, Optionee acknowledges and agrees that the ultimate liability for all Tax-Related Items is and remains Optionee's responsibility and may exceed any amount actually withheld by the Company or any Subsidiary or Affiliate. Optionee further acknowledges and agrees that Optionee is solely responsible for filing all relevant documentation that may be required in relation to this Option or any Tax-Related Items other than filings or documentation that is the specific obligation of the Company or any Subsidiary or Affiliate pursuant to Applicable Law, such as but not limited to personal income tax returns or reporting statements in relation to the grant, vesting or exercise of this Option, the holding of Shares or any bank or brokerage account, the subsequent sale of Shares, and the receipt of any dividends. Optionee further acknowledges that the Company makes no representations or undertakings regarding the treatment of any Tax-Related Items and does not commit to and is under no obligation to structure the terms or any aspect of the Option to reduce or eliminate Optionee's liability for Tax-Related Items or achieve any particular tax result. Further, if Optionee has become subject to tax in more than one jurisdiction, Optionee acknowledges that the Company or any Subsidiary or Affiliate may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

        (iii)    The Company is not obligated, and will have no liability for failure, to issue or deliver any Shares upon exercise of this Option unless such issuance or delivery would comply with the Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel. Furthermore, Optionee understands that the Applicable Laws of the country in which Optionee is residing or working at the time of grant, vesting, and/or exercise of this Option (including any rules or regulations governing securities, foreign exchange, tax, labor or other matters) may restrict or prevent exercise of this Option. This Option may not be exercised until such time as the Plan has been approved by the holders of capital stock of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such Shares would constitute a violation of any Applicable Laws, including any applicable U.S. federal or state securities laws or any other law or regulation, including any rule under Part 221 of Title 12 of the Code of Federal Regulations as promulgated by the Federal Reserve Board. As a condition to the exercise of this Option, the Company may require Optionee to make any representation and warranty to the Company as may be required by the Applicable

Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Optionee on the date on which this Option is exercised with respect to such Shares.

        (iv)     Subject to compliance with Applicable Laws, this Option shall be deemed to be exercised upon receipt by the Company of the appropriate written notice of exercise accompanied by the Exercise Price and the satisfaction of any applicable obligations described in Section 3(b)(ii) above.

      4.     **Method of Payment.**  Payment of the Exercise Price shall be by cash or check or, following the initial public offering of the Company's Common Stock, by Cashless Exercise pursuant to which the Optionee delivers an irrevocable direction to a securities broker (on a form prescribed by the Company and according to a procedure established by the Company), or by such other methods allowed by the Plan if permitted in the Company's sole discretion.

      Optionee understands and agrees that, if required by the Company to comply with Applicable Laws, any cross-border cash remittance made to exercise this Option or transfer proceeds received upon the sale of Shares must be made through a locally authorized financial institution or registered foreign exchange agency and may require Optionee to provide to such entity certain information regarding the transaction. Moreover, Optionee understands and agrees that the future value of the underlying Shares is unknown and cannot be predicted with certainty and may decrease in value, even below the Exercise Price. Optionee understands that neither the Company nor any Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between local currency and the United States Dollar or the selection by the Company or any Subsidiary or Affiliate in its sole discretion of an applicable foreign currency exchange rate that may affect the value of the Option (or the calculation of income or Tax-Related Items thereunder).

      5.     **Termination of Relationship.**  Following the date of termination of Optionee's Continuous Service Status for any reason (the "Termination Date"), Optionee may exercise this Option only as set forth in the Notice and this Section 5. If Optionee does not exercise this Option within the Termination Period set forth in the Notice or the termination periods set forth below, this Option shall terminate in its entirety. In no event, may any Option be exercised after the Expiration Date of this Option as set forth in the Notice. For the avoidance of doubt and for purposes of this Option only, termination of Continuous Service Status and the Termination Date will be deemed to occur as of the date Optionee is no longer actively providing services as an Employee or Consultant (except to the extent Optionee is on a Company approved leave of absence) and will not be extended by any notice period or "garden leave" that is required contractually or under Applicable Laws.

        (a)     **Termination for Good Reason or Not for Cause.**  In the event of termination of Optionee's Continuous Service Status for Good Reason (as defined below) or by the Company not for Cause the Option shall become fully vested on the Optionee's Termination Date and this Option may be exercised by the Optionee within one hundred twenty (120) days after the date on which the Optionee's Continuous Service terminated, but in any event no later than the Option Expiration Date. If the Optionee is a party to an employment, Change of Control, or other service agreement with the Company or a Subsidiary or Affiliate and such agreement provides for a definition of Good Reason, the definition contained in the agreement shall apply for purposes of this Section 5(a). In all other cases, Good Reason shall mean:

(i)  a material diminution in Optionee's authority, duties, or responsibilities; or

(ii)  a material reduction of Optionee's base salary, as the same may have been increased from time to time, other than a percentage reduction applicable generally to all or a significant number of the Company's employees;

provided that, in the case of either (i) or (ii), Good Reason shall not be deemed to exist unless the circumstances alleged to constitute Good Reason are not remedied by the Company within thirty (60) days of its receipt of a written notice from the Optionee describing the applicable circumstances (which notice must be provided by the Optionee within ninety (90) days of the initial occurrence of the applicable circumstances).

(b)    **Termination By Employee Without Good Reason.** In the event that the Optionee decides to terminate his Continuous Service Status without Good Reason, Optionee may, but only within sixty (60) days following the Termination Date, exercise this Option to the extent Optionee had become vested in the Optioned Stock as of the Termination Date. In such event, the vested portion of this Option will be exercisable at an increased exercise price equal to the average of: (i) the price per share of Common Stock in the most recent offering of Common Stock to one or more investors, as determined by the Company; and (ii) the price per share of Common Stock under the most recent valuation conducted for purposes of Code section 409A, provided such valuation is as of a date no more than 12 months prior to the Termination Date. Notwithstanding the preceding sentence, the exercise price shall in no event be less than the exercise price per Share set forth in the Notice (as adjusted, if applicable, under Section 9 of the Plan). The Option, to the extent unvested on the Termination Date, shall lapse.

(c)    **Termination upon Disability of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's Disability (or, if Optionee is party to an employment agreement with the Company or a Subsidiary of Affiliate, Optionee's "disability" as defined in such employment agreement), Optionee may, but only within one hundred twenty (120) days following the Termination Date, exercise this Option to the extent Optionee had become vested in the Optioned Stock as of the Termination Date.

(d)    **Death of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's death, or in the event of Optionee's death within 3 months following Optionee's Termination Date, this Option may be exercised at any time within 12 months following the Termination Date, or if later, one hundred twenty (120) days following the date of death by any beneficiaries designated in accordance with Section 15 of the Plan or, if there are no such beneficiaries, by the Optionee's estate, or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent Optionee had become vested in the Optioned Stock as of the Termination Date.

(e)    **Termination for Cause.** In the event of termination of Optionee's Continuous Service Status for Cause, this Option (including any vested portion thereof) shall immediately terminate in its entirety upon notification to Optionee of such termination for Cause. If Optionee's Continuous Service Status is suspended pending an investigation of whether Optionee's Continuous Service Status will be terminated for Cause, all Optionee's rights under

this Option, including the right to exercise this Option, shall be suspended during the investigation period.

6.    **Non-Transferability of Option; Stockholders Agreement.**

(a)    This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by him or her.  The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of Optionee.

(b)    As a condition precedent to entering into this Agreement, at the request of the Company, Optionee shall become a party to any stockholders agreement to which the Company is a party at the time of Optionee's execution and delivery of this Agreement, or to which the holders of at least 50% of the outstanding shares of Common Stock may become parties after Optionee's execution and delivery of this Agreement, in each case as such stockholders agreement may be amended from time to time (the "Stockholders Agreement"), by executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to the terms of the Stockholders Agreement as a "Stockholder," if and as such term may be defined in the Stockholders Agreement.

7.    **Lock-Up Agreement.**  If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Optionee shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Optionee shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

8.    **Effect of Agreement.**  Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof (and has had an opportunity to consult counsel regarding the Option terms), and hereby accepts this Option and agrees to be bound by its contractual terms as set forth herein and in the Plan.  Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Administrator regarding any questions relating to this Option.  In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of the Notice and this Agreement, the Plan terms and provisions shall prevail.

9.    **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on Optionee's participation in the Plan, on the Option and on any Award or Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with Applicable Laws or facilitate the administration of the Plan.  Optionee agrees to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.  Furthermore, Optionee acknowledges that the laws of the country in which Optionee is working at the time of grant, vesting and exercise of the Option or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign

exchange, tax, labor, or other matters) may subject Optionee to additional procedural or regulatory requirements that Optionee is and will be solely responsible for and must fulfill.

10.    **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents related to Optionee's current or future participation in the Plan, this Option, the Shares subject to this Option, any other Company Securities or any other Company-related documents, by electronic means.  Optionee hereby (i) consents to receive such documents by electronic means, (ii) consents to the use of electronic signatures, and (iii) if applicable, agrees to participate in the Plan and/or receive any such documents through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.  To the extent Optionee has been provided with a copy of this Agreement, the Plan, or any other documents relating to this Option in a language other than English, the English language documents will prevail in case of any ambiguities or divergences as a result of translation.

11.    **No Acquired Rights.**  In accepting the Option, Optionee acknowledges that the Plan is established voluntarily by the Company, is discretionary in nature, and may be modified, amended, suspended or terminated by the Company at any time.  The grant of the Option is voluntary and occasional and does not create any contractual or other right to receive future grants of Options, other Awards or benefits in lieu of Options, even if Options have been granted repeatedly in the past, and all decisions with respect to future grants of Options or other Awards, if any, will be at the sole discretion of the Company.  In addition, Optionee's participation in the Plan is voluntary, and the Option and the Shares subject to the Option are extraordinary items that do not constitute regular compensation for services rendered to the Company or any Subsidiary or Affiliate and are outside the scope of Optionee's employment contract, if any.  The Option and the Shares subject to the Option are not intended to replace any pension rights or compensation and are not part of normal or expected salary or compensation for any purpose, including but not limited to calculating severance payments, if any, upon termination.

12.    **Data Privacy.**  *Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Optionee's personal data (as described below) by and among, as applicable, the Company and any Subsidiary or Affiliate for the exclusive purpose of implementing, administering, and managing Optionee's participation in the Plan.  Optionee understands that refusal or withdrawal of consent may affect Optionee's ability to participate in the Plan or to realize benefits from the Option.*

*Optionee understands that the Company and any Subsidiary or Affiliate may hold certain personal information about Optionee, including, but not limited to, Optionee's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company or any Subsidiary or Affiliate, details of all Options or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in Optionee's favor ("Personal Data").  Optionee understands that Personal Data may be transferred to any Subsidiary or Affiliate or third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in the United States, Optionee's country, or elsewhere, and that the recipient's country may have different data privacy laws and protections than Optionee's country.*

13.    **Miscellaneous.**

(a)    **Governing Law.**    The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b)    **Entire Agreement.**    This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)    **Amendments and Waivers.**    No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.    No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)    **Successors and Assigns.**    Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.    The Company may assign any of its rights and obligations under this Agreement.    No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)    **Notices.**    Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f)    **Severability.**    If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)    **Construction.**    This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)    **Counterparts.**    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all

of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

# EXHIBIT A

## PHLOW CORP.

## 2020 STOCK OPTION PLAN

## EXERCISE AGREEMENT

This Exercise Agreement (this "Agreement") is made as of _____, by and between PHLOW CORP., a Delaware public benefit corporation (the "Company"), and _____ ("Purchaser").  To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the PHLOW CORP. 2020 Stock Option Plan (the "Plan") and the Option Agreement (as defined below).

1.    **Exercise of Option.**  Subject to the terms and conditions hereof, Purchaser hereby elects to exercise his or her option to purchase _____ shares of the Common Stock (the "Shares") of the Company under and pursuant to the Plan, the Notice of Stock Option Grant and the Stock Option Agreement granted _____ (the "Option Agreement").  The purchase price for the Shares shall be $_____ per Share for a total purchase price of $_____.  The term "Shares" refers to the purchased Shares and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.    **Time and Place of Exercise.**  The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution and delivery of this Agreement, the payment of the aggregate exercise price by any method listed in Section 4 of the Option Agreement, and the satisfaction of any applicable tax, withholding, required deductions or other payments, all in accordance with the provisions of Section 3(b) of the Option Agreement.  The Company shall issue the Shares to Purchaser by entering such Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company, against payment of the exercise price therefor by Purchaser.  The Company will deliver to Purchaser a stock certificate or, in the case of uncertificated securities upon request, a notice of issuance, for the Shares as soon as practicable following such date.

3.    **Call Option.**  The Shares are subject to any and all limitations on transfer created by the transfer restrictions set forth in the Stockholders Agreement and Applicable Law, and Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions thereof.  In addition, subject to the terms of this Section, if the Optionee's employment with the Company terminates or expires for any reason or without reason, the Company shall have the option (the "Call Option"), but not the obligation, to purchase any or all Shares that (x) are subject to purchase by Optionee pursuant to the Option Agreement on the date of termination or expiration of Optionee's employment with the Company and are purchased after such termination or expiration date or (y) were purchased at any time prior to the termination or expiration of the Optionee's employment.  The purchase price per share of the Call Option shall

be the greater of (i) Fair Market Value as of termination of employment, (ii) the purchase price per Share set forth in Section 1 of this Agreement, and (iii) the exercise price per share set forth in the last incentive stock option, if any, issued by the Company during the three (3) month period immediately preceding termination of employment. The purchase price shall be payable in cash at closing. The Call Option shall be exercised by written notice by the Company to the Optionee (the "Call Notice") within 90 days after the later of (i) the date of termination or expiration of Optionee's employment with the Company or (ii) the date of acquisition by the Optionee of Shares that is subject to the Call Option. The closing of the Call Option shall occur within 90 days after the date of the Call Notice and shall take place at the Company's principal office. If the Optionee fails to deliver the Shares identified in the Call Notice duly endorsed for transfer to the Company at such closing, then all rights with respect to such Shares, including, without limitation, any right to vote or receive dividends with respect to such Shares, shall forthwith after such closing terminate, except only the right of the holder to receive the payment described above, without interest, upon surrender of their certificate or certificates therefor.

4.     **Investment and Taxation Representations.**  In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)     Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b)     Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)     Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d)     Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 4(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 4(e) below.

(e)     Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)     Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as <u>Annex I</u>).

(g)     Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

**5.     <u>Restrictive Legends and Stop-Transfer Orders.</u>**

(a)     <u>**Legends.**</u>  Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares shall bear the following legends (as well as any legends set forth in the Stockholders Agreement or required by the Company or applicable state and federal corporate and securities laws):

> THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

> THE SECURITIES REFERENCED HEREIN ARE SUBJECT TO A CALL OPTION IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

(b)     <u>**Stop-Transfer Notices.**</u>  Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     <u>**Refusal to Transfer.**</u>  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

6.     **No Employment Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, Subsidiary or Affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.     **Waiver of Statutory Information Rights.**     Purchaser acknowledges and understands that, but for the waiver made herein, Purchaser would be entitled, upon written demand under oath stating the purpose thereof, to inspect for any proper purpose, and to make copies and extracts from, the Company's stock ledger, a list of its stockholders, and its other books and records, and the books and records of subsidiaries of the Company, if any, under the circumstances and in the manner provided in Section 220 of the Delaware General Corporation Law (any and all such rights, and any and all such other rights of Purchaser as may be provided for in Section 220, the "Inspection Rights").  In light of the foregoing, until the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, Purchaser hereby unconditionally and irrevocably waives the Inspection Rights, whether such Inspection Rights would be exercised or pursued directly or indirectly pursuant to Section 220 or otherwise, and covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The foregoing waiver applies to the Inspection Rights of Purchaser in Purchaser's capacity as a stockholder and shall not affect any rights of a director, in his or her capacity as such, under Section 220.  The foregoing waiver shall not apply to any contractual inspection rights of Purchaser under any written agreement with the Company.

8.     **Miscellaneous.**

(a)     **Governing Law.**     The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b)     **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)     **Amendments and Waivers.**  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)     **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this

Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)    **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f)    **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)    **Construction.**  This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

(i)    **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

*[Signature Page Follows]*

The parties have executed this Exercise Agreement as of the date first set forth above.

**THE COMPANY:**

PHLOW CORP.

By:_____
                (Signature)

Name:
Title:

Address:

**PURCHASER:**

_____
(PRINT NAME)

_____
(Signature)

Address:
_____
_____
_____
Email:_____

-6-

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

    (A) At the time of such sale, bars the person from:

        (1) Association with an entity regulated by such commission, authority, agency, or officer;

        (2) Engaging in the business of securities, insurance or banking; or

        (3) Engaging in savings association or credit union activities; or

    (B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

    (A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

    (B) Places limitations on the activities, functions or operations of such person; or

    (C)Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

    (A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

    (B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

| | |
|---|---|
| **From:** | Heidi Dillard |
| **To:** | Nathan Richards |
| **Cc:** | Andrew Stiles; Mark A. Berman; Kim Daniel |
| **Subject:** | A. Stiles - Stock Option Grant Documents |
| **Date:** | Wednesday, December 8, 2021 11:45:13 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

Nathan,

Good morning! Per our conversation, please send Andrew his Stock Option Grant that you provided to him on 13 August 2021. As you know, Andrew didn't respond to your email, nor did he sign the documents. Once he executes the document, I will be prepared to countersign.

Please let me know if you have any questions or concerns.

Best,

Heidi

Heidi Dillard
Chief Human Resources Officer
Phlow Corporation

804 774 0344 (m)



1001 Haxali Point, #1B
Richmond, VA 23119
phlow-usa.com





**We're Great Place to Work Certified™!**
Click here to learn what makes our company culture great.

| From: | Heidi Dillard |
|---|---|
| To: | Andrew Stiles |
| Cc: | Mark Berman; Kim Daniel |
| Subject: | Re: Stiles - Exercising Vested Stock Options |
| Date: | Wednesday, December 8, 2021 11:40:54 AM |

Andrew,

Good morning.  I hope you are having a great day!

I've dug in a little and it seems that we do not have your signed Amended and Restated Notice of Stock Option Grant document that Nathan sent to you on August 13, 2021.  I've asked him to resend the document to you since we'll need it to exercise any of your vested options.  I'll send a separate email to him with you in copy giving him direction.  Once we get your signed document, I'll counter-sign and we'll work on next steps.

Best,

Heidi

**From:** Heidi Dillard <hdillard@phlow-usa.com>
**Date:** Monday, December 6, 2021 at 9:12 AM
**To:** Andrew Stiles <jandrew.stiles@gmail.com>
**Cc:** Mark Berman <mberman@ganfershore.com>, Kim Daniel <kdaniel@hancockdaniel.com>
**Subject:** Re: Stiles - Exercising Vested Stock Options

Andrew,

Good morning!  I hope you and yours had a good Thanksgiving.  I'm glad to hear that we were able to enroll your daughter into our healthcare plan even though you missed the enrollment deadline by a few weeks.  Sarah pulled in a few favors for you!

Thank you so much for your note.  I will look into your request below and verify the quantum vested and other pertinent information and revert.

Have a great day!

Best,

Heidi

**From:** Andrew Stiles <jandrew.stiles@gmail.com>
**Date:** Friday, December 3, 2021 at 3:44 PM
**To:** Heidi Dillard <hdillard@phlow-usa.com>

**Cc:** Mark Berman <mberman@ganfershore.com>
**Subject:** Stiles - Exercising Vested Stock Options

**CAUTION:** This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you know the content is safe.

Hi Heidi,

As December 16th approaches without a termination/separation agreement in place, I would like to go ahead and exercise my currently vested stock options...which should be 31,250 options (25,000 vested 9/1/21 and 6,250 vested 12/1/21) at the exercise price of $5.41. Will you please have Phlow Finance/Accounting draft up the *Exercise Agreement* as I no longer have access to the template and advise on payment instructions.

Thanks,
Andrew